UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:                                                    Chapter 11

AMAGANSETT FAMILY FARM, INC.                              Case No. 11-73929 (AST)

                        Debtor.
------------------------------------------------------------------X
In re:                                                    Chapter 11

AMAGANSETT COMMONS, LLC                                   Case No. 11-73928 (AST)

                        Debtor.
------------------------------------------------------------------X
In re:                                                    Chapter 11

OCEAN VINE, INC.                                          Case No. 11-73930

                        Debtor.
------------------------------------------------------------------X


## AFFIDAVIT OF RICHARD J. PRINCIPI, JR.
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4

**STATE OF NEW YORK )**
                                )ss:
**COUNTY OF SUFFOLK )**

    **RICHARD J. PRINCIPI, JR.**, duly sworn deposes and states as follows:

    1.    I am the President of Amagansett Family Farm, Inc. ("<u>Amagansett Family Farm</u>")

and Ocean Vine, Inc. ("<u>Ocean Vine</u>"). I am also the Managing Member of Amagansett

Commons, LLC ("<u>Amagansett Commons</u>"), (together with Amagansett Family Farm and Ocean

Vine, the debtors and debtors-in-possession herein, collectively, the "<u>Debtors</u>," or in the singular

as used with specificity "<u>Debtor</u>").

    2.    I have been associated with the Debtors in my current capacity since their

inception. In that capacity, I am familiar with the day-to-day operations, business and financial

affairs of the Debtors.

1453170v4

3.     This Affidavit is submitted pursuant to Rule 1007-4 of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"). Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge and my review of relevant documents (to the extent available).

4.     On May 31, 2011 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors intend to continue in the possession of their properties and the management of their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, and to reorganize under Chapter 11.

5.     The Debtors are not "small business debtors" within the meaning of Bankruptcy Code §101(51D).

## BACKGROUND

6.     For the past fifty (50) years, my family has been building and developing custom homes and commercial buildings on the East End of Long Island, particularly in East Hampton, Amagansett and Southold, New York. For the past twenty (20) years, I have been running my family's real estate development and construction businesses.

7.     Over the course of those past twenty (20) years, I have been personally involved in at least twenty five (25) separate development construction projects, both on the high-end residential side, as well as for commercial properties.

8.     During the past twenty (20) years, my family and our various companies have also acquired and developed at least twenty five (25) different parcels of land, some of which have been in my family for many years, including the ones which are the subject of these bankruptcy petitions. A discussion of these specific properties is set forth below.

## THE DEBTORS' PROPERTIES AND THEIR BUSINESS

9.      The Debtors own three (3) separate properties, located at 531 Montauk Highway, Amagansett, New York (the "531 Montauk Highway Property"), 551 Montauk Highway, Amagansett, New York (the "551 Montauk Highway Property") and 561 Montauk Highway, Amagansett, New York (the "561 Montauk Highway Property"). A brief description of these properties, and certain of their potential uses, is set forth below.

### The 531 & 561 Montauk Highway Properties

10.     The 531 Montauk Highway Property, which has a total of 4.6 acres, is on the Western side of the Debtors' three (3) properties, and which are collectively referred to herein as "Ocean View Farm." This site has the town of East Hampton's preliminary approval to be subdivided into four – 1/3 acre building lots, which are located toward the North side of the site. The balance of 3.3 acres, between Montauk Highway and the houses, would be set aside as an Agricultural Reserve with one of the planned uses as a vineyard or as an equestrian horse farm/riding academy.

11.     The 561 Montauk Highway Property, which has a total of 11.98 acres, is on the eastern side of Ocean View Farm. This site has the town of East Hampton's preliminary approval to be subdivided into four (4) one-half (½) acre building lots, which are located toward the North side of the site. The balance of 8.98 acres, between Montauk Highway and the houses, would also be set aside as an Agricultural Reserve with one of the planned uses to plant a Vineyard.

12.     These easily accessible sites are well located to take advantage of all that the town of East Hampton has to offer year-round.

13.     These two (2) properties have a total of eight (8) building lots. Each property has one lot with a completed foundation in place, building permits in full force and effect, and are

ready to start construction. One site would be built initially as a model house and sales office, and the other existing foundation could also be a model house or sold outright.

14.     The houses would be custom designed to take advantage of the expansive views in all directions, especially South toward the Atlantic Ocean, which is only .75 miles away.

**The 551 Montauk Highway Property**

15.     This separately deeded 7.2 acre site is located directly in between the 531 and 561 Montauk Highway Properties, and shares common lot lines with each. Together, these three separate properties make up one contiguous location that has a total of 23.78 acres, with frontage on the north side of Montauk Highway of 1,895 feet. There would be three separate entrances, one into each parcel.

16.     The 551 Montauk Highway Property is improved with a 40' wide x 120' long building that is currently configured as a horse barn on the ground floor, has 3,500 sq. ft. of residential space on the second floor with 6 bedrooms and 3 full bathrooms, and a 12' high basement under the entire building. This building is located within its own 1.5 acre site within the 7.2 acre lot. Due to the building's original intended use as a horse barn, the floor of the ground floor is built as a 6" thick poured reinforced concrete slab on a corrugated steel deck, which will allow for many other uses that involve heavy concentrated weights. The basement has a truck ramp that will allow for vans and trucks up to 10' tall to drive directly into it. The entrance to the second floor is separate from the rest of the first floor space.

17.     The existing building can be converted to a number of other business uses that would fit in well within the Hamptons environment.

18.     The Ocean View Farm properties can be, and have been, utilized to host art shows and other events. Through the elimination of the existing horse stalls, 2,000 sq. ft. would become available for larger indoor use. Each event would have the potential of bringing in

upwards and in excess of $25,000, with an allowance of 6 events per year under the town of East Hampton's building code. The second floor residence could be rented out on a year-round basis, as could a portion of the basement to a commercial tenant.

19.    Other options being considered are to convert the entire building for use as part of a winery and spa/health club facility, or for use as an equestrian riding academy. The 3,500 sq. ft. second floor could be converted into several differently used spaces, some open to the general public, and some open only to the residents of "Ocean View Farm." The staircase to the second floor enters into the large 1,500 sq. ft. central section, which has a large full use kitchen on its western side, and a full bathroom across the way. This central area is ideal for open use by the public for wine and cheese tastings, cooking classes, as well as for the retail sale of wine, cheese, clothing, books, etc. The northerly part of the second floor is already a segregated 1,000 sq. ft. area, with a full bathroom which could be open to the public.

## THE DEBTORS' SECURED CREDITOR

## Madison Realty Capital, L.P.

20.    Madison Realty Capital, L.P. ("Madison"), a hedge fund, is the only secured creditor in these cases, having made a loan to the Debtors, and certain non-debtor affiliates (collectively with the Debtors, the "Borrowers") on or about August 20, 2007, to refinance existing loans on properties owned by the Borrowers. The particulars of the loan transactions are more fully described below.

21.    Madison's mortgage originally encumbered seven (7) properties, owned by the Borrowers, and provided for a construction loan to complete ongoing projects on the properties. The construction draws were to be used to build and complete a restaurant at "Southold Pointe"

in Southold, NY, and to develop an exclusive vineyard community at "Ocean View Farm" in Amagansett, NY.[1]

22.     Madison's loan to the Debtors, and the four (4) related non-debtors (Bluff Road Realty, LLC, Southold Pointe LLC, North Fork Resources, Inc., and Amagansett Business Center, Inc.), collectively, was in the original principal amount of Twenty Million Seven Hundred Twenty Thousand and 00/100 Dollars ($20,720,000.00), and evidenced by a Note dated as of June 29, 2007.

23.     As part of the transaction, Madison became the holder of an Agreement of Spreader, Consolidation and Modification of Mortgage, dated June 29, 2007 (the "First Mortgage"), encumbering the following real property and improvements: (a) the 531 Montauk Highway Property; (b) the 551 Montauk Highway Property; (c) 561 Montauk Highway Property; (d) 64300 Main Road, Southold, New York (the "Southold Marina"); (e) 8595 Cox Lane, Cutchogue, New York (the "Cutchogue Business Center"); (f) 136 Main Street, Amagansett, New York (the "Amagansett Business Center"); and (g) 138 Bluff Road, Amagansett, New York (the "Bluff Road Property").

24.     In August 2007, upon the sale of the Bluff Road Property (which was owned by Bluff Road Realty, LLC), Madison's loan to the Debtors was paid down by approximately Four Million Dollars ($4,000,000) from the proceeds of sale. Madison's loan was amended by an Amended and Restated Note dated August 20, 2007 (as amended, the "First Mortgage Note"), in the original principal amount of Sixteen Million Seven Hundred Thirty Thousand and One Hundred Thirty and 00/100 ($16,730,130.00) Dollars (the "First Mortgage Loan").

---

[1] As will be described in more detail below, one (1) of the properties was sold and the proceeds used to pay down Madison's mortgage, and three (3) of the properties were owned by non-debtor affiliates and were transferred to Madison by deed in lieu of foreclosure prior to the Debtors' Chapter 11 filings.

25.     In addition to the First Mortgage Loan, Madison made a building/construction loan to Amagansett Commons, Amagansett Family Farm and Southold Pointe, LLC, collectively, in the original principal amount of Four Million Seven Hundred Five Thousand and 00/100 ($4,705,000.00) Dollars (the "Building Loan"), evidenced by a Building Loan Note dated as of August 20, 2007 (the "Building Loan Note"), in the original principal amount of the Building Loan.

26.     As part of the Building Loan transaction, Madison became the holder of a Building Loan Mortgage and Security Agreement dated August 20, 2007 (the "Building Loan Mortgage"), encumbering the following real property and improvements:  (a) the 531 Montauk Highway Property; (b) the 561 Montauk Highway Property; and (c) the Southold Marina.

27.     Madison also made a project loan to Amagansett Commons, Amagansett Family Farm and Southold Pointe, LLC, collectively, in the original principal amount of Five Hundred Eighty-Seven Thousand and 00/100 ($587,000.00) Dollars (the "Project Loan"), evidenced by a Project Loan Note dated as of August 20, 2007 (the "Project Loan Note"), in the original principal amount of the Project Loan.

28.     Madison also became the holder of a Project Loan Mortgage and Security Agreement dated August 20, 2007 (the "Project Loan Mortgage"), encumbering the following real property and improvements: (a) the 531 Montauk Highway Property; (b) the 561 Montauk Highway Property; and (c) the Southold Marina.

29.     The First Mortgage Loan, the Building Loan Mortgage and the Project Loan Mortgage all cross defaulted with each other.  These loans also later became secured by certain joint and several guarantees (the "Guarantees") of Richard Principi, Virginia Principi, Emeterio Velasquez, Yvonne Velasquez and Dolores Principi.

30.     The original scheduled maturity date under the First Mortgage Loan, the Building Loan and the Project Loan was August 19, 2008. Our strategy was to build-out the projects, refinance Madison with a conventional lender, and then sell the properties.

## EVENTS LEADING UP TO THE
## COMMENCEMENT OF THESE CHAPTER 11 CASES

31.     Under the Building Loan, Madison required that its engineer, Blake Global, inspect the progress of the projects and approve any draws from the Building Loan. From August 2007 through February 2008, each request that was made with respect to draws from the Building Loan was reviewed and approved by Blake Global.

32.     As of February 2008, five (5) draws had been completed for Southold Pointe in the total amount of $1,057,500.00, and three (3) draws were completed for Ocean View Farm in the total amount of $1,196,000.00.

33.     In March 2008, while a draw request was pending, Madison notified the Debtors that it was terminating its project engineer, Blake Global, and hiring a new engineer to "re-evaluate the properties for further funding."

34.     Madison's new engineer initially advised Madison that the projects were "out-of-balance," and that the remaining draw amounts needed to be "reapportioned." We vehemently disagreed with this assessment. In fact, as a result of our lengthy experience in building on the East End of Long Island, by February 2008 we were five (5) months ahead of our projections in terms of progress on the construction projects.

35.     However, two (2) months later, after we reworked the proposed draws three times, Madison's engineer still believed that the building loan was "out of balance" and that no further draws would be permitted. Madison then halted the funding on all the projects.

36.     Although we made requests to Madison for an explanation and an accounting for their determination that the Building Loan was "out of balance," no accounting or explanation was provided.

37.     During the time it took Madison to determine whether to allow the requested draws under the Building Loan, we continued to work on the projects, incurring significant trade debt. Moreover, as a result of Madison's decision to cease funding, my family and I spent at least $1.25 million of our own money in order to satisfy the unpaid trade debt and building suppliers, and to attempt to continue the completion of the projects.

38.     At the time Madison had cut off the Building Loan draws, we had only drawn down less than fifty (50%) percent of the Building Loan.

39.     On July 18, 2008, Madison transmitted written notice to the Borrowers of the alleged default (the "Default Notice") under the Building Loan.

## THE NON-JUDICIAL FORECLOSURE

40.     Upon expiration of the notice period provided in the Default Notice, Madison commenced a non-judicial foreclosure against the Cutchogue Business Center (which property was owned by North Fork Resources, Inc.).

41.     The basis for commencing the non-judicial foreclosure against the Cutchogue Business Center was that the Borrowers had failed to bring the Building Loan back into "balance," despite the fact that the Borrowers disputed they were ever out of balance in the first place.

42.     At the time the non-judicial foreclosure was commenced, the value of the Cutchogue Business Center was approximately $4.5 million.

43.     In order to prevent the loss to my family of the Cutchogue Business Center, and to save the approximate $1.25 million investment of our own money into the properties, we

engaged in extended negotiations with Madison, which culminated in the Forbearance Agreement described below.

## THE FORBEARANCE AGREEMENT

44.    On April 3, 2009, the Borrowers and Madison entered into a forbearance agreement (the "Forbearance Agreement"), whereby, as consideration for Madison agreeing to forebear from causing the sale of the Cutchogue Business Center through the non-judicial foreclosure, the Borrowers provided Madison with, *inter alia*:  (i) deeds in lieu of foreclosure for all of the properties (including the Debtors' properties) securing the Borrowers' obligations to Madison; (ii) the Guarantees; (iii) confessions of judgment; (iv) assignments and security interests in all of the stock and or membership interests of the Borrowers' members or shareholders in the Borrowers; and (v) an amendment to each of the Borrowers' organizational documents requiring that an "independent director," approved by Madison, be appointed to the Borrowers' boards, and whose affirmative vote would be required prior to such Borrower seeking relief under the Bankruptcy Code.

45.    The Forbearance Agreement was scheduled to terminate on January 31, 2010.  If terminated, Madison would have caused the deeds in lieu of foreclosure, and the confessions of judgment in the approximate amount of $21.0 million, to be filed.

## THE AMENDED FORBEARANCE AGREEMENT

46.    In order to avoid losing all of the Borrowers' properties under the terms of the Forbearance Agreement, and to avoid the loss of the approximate $1.25 million advanced by myself and my family to continue the project construction, the Borrowers entered into negotiations with Madison to extend the Forbearance Agreement, ultimately executing an Amendment to Forbearance Agreement and Deed-In-Lieu of Foreclosure Agreement (the "Amended Forbearance Agreement") dated as of August 2, 2010.

47. Under the Amended Forbearance Agreement, *inter alia*, Madison received a deed-in-lieu of foreclosure to both the Cutchogue Business Center and the Southold Marina (which were owned by North Fork Resources, Inc. and Southold Point LLC, respectively). The outstanding indebtedness was reduced by $8.0 million, and the forbearance expiration date was extended to September 30, 2010.

48. Although an extension of the forbearance expiration date was accomplished, it came at the cost of deeding the Cutchogue Business Center and the Southold Marina to Madison. Moreover, by the time the Amended Forbearance Agreement was finally executed on August 2, 2010, the forbearance expiration period was set to expire in less than sixty (60) days.

## THE SECOND AMENDED FORBEARANCE AGREEMENT

49. As the Amended Forbearance Agreement was about to expire, we again entered into negotiations with Madison to, *inter alia*, extend the expiration date. Ultimately, on October 27, 2010, we entered into the Second Amendment to Forbearance Agreement and Deed-in-Lieu of Foreclosure Agreement (the "Second Amended Forbearance Agreement"), effective as of September 30, 2010. The Second Amended Forbearance Agreement provided, *inter alia*, for a further extension of the forbearance expiration date to June 1, 2011, for the transfer to Madison, by deed in lieu of foreclosure, of the Amagansett Business Center (which property was owned by Amagansett Business Center, Inc.), and for a $2.4 million reduction of the amount of the outstanding indebtedness.

50. As the June 1, 2011 expiration date approached, the Debtors asked Madison for a further extension, which was refused, leaving the Debtors with only two alternatives; namely, either allow the Second Amended Forbearance Agreement to expire, which would result in the transfer of the Debtors' properties to Madison under the deeds-in-lieu of foreclosure, or to file these bankruptcy proceedings.

## THE BANKRUPTCY FILINGS

51.    The Debtors' only real option was to file for protection under Chapter 11 of the Bankruptcy Code.

52.    As stated above, Madison had previously required that each of the Debtors amend its corporate documents in order to add an "independent director" (the "Independent Director"). Pursuant to the terms of the corporate documents, as amended, prior to a bankruptcy proceeding being filed, it was a prerequisite that the Independent Director affirmatively authorize such filing.

53.    On May 31, 2011, pursuant to written consents in lieu of meetings, the directors, including the Independent Director, authorized the Debtors to file these Chapter 11 proceedings, as in the best interests of the Debtors, their creditors and parties in interest.

54.    The board authorization and the filing of these proceedings occurred before the June 1, 2011 expiration of the Second Amended Forbearance Agreement.  By filing for Chapter 11 protection, the Debtors will be afforded the breathing room they need to accomplish a number of goals that will ultimately inure to the benefit of the Debtors' estates, their creditors and parties in interest, including Madison.

## STEPS TOWARDS REORGANIZATION

55.     The Debtors have obtained numerous permits and entitlements, which have increased the value of the properties by facilitating the ability to complete the projects and maximize the properties' values. In addition, to facilitate a reorganization plan or, if necessary, the sale of some or all of the properties, the Debtors will be actively marketing the properties in these Chapter 11 proceedings.

56.     While actively marketing the properties, the Debtors will continue to maintain their properties and operate their business, which will preserve and maximize the value of the properties.

## THE FIRST THIRTY DAYS

57.     During the first thirty (30) days of these cases, the Debtors will have no income and minimal expenses. Any shortfall will be advanced by the Debtors' principals or their family.

58.     In addition, the Debtors' principals are not taking any salaries from the Debtors or these projects, and the maintenance and work being done on the properties is being paid for by a non-debtor entity owned by the principals of the Debtors.

## ADDITIONAL DISCLOSURES UNDER LOCAL RULE 1007-4

59.     The Debtors' existing senior management, their tenure with the Debtors, and experience is as follows:

> **Richard J. Principi, Jr.** – is the President and/or Managing Member of the Debtors with 20 years experience developing properties and constructing custom homes and commercial buildings on the East End of Long Island.

60.     I attest to the veracity of the annexed *Exhibit 1* (listing the Debtors' twenty (20) largest creditors, *Exhibit 2* (listing the five (5) largest secured creditors of all of the Debtors) and *Exhibit 3* (identifying any pending litigations against any of the Debtors).

61.    The Debtors' books and records are located primarily with the Debtors' accountants, Grumet, Mayne & Co., LLC, with offices at 1991 South Street, Merrick, NY 11566.

62.    A consolidated summary of the Debtors' assets and liabilities is attached hereto as *Exhibit 4.*

63.    The Debtors have no employees, and therefore the estimated weekly payroll to employees (exclusive of officers, directors, shareholders, partners or members) for the 30-day period following the filing of the chapter 11 petitions is zero dollars ($0.00).

64.    Furthermore, the Debtors' officers, directors and managers will not draw any salaries, and therefore the payroll for officers, directors and managers for the 30-day period following the filing of the chapter 11 petitions is also zero dollars ($0.00).

65.    A schedule for the 30-day period following the filing of the chapter 11 petitions of the Debtors' estimated cash receipts and disbursements, net cash gains or losses, and obligations and receivables expected to accrue but remain unpaid (other than professionals) on a consolidated basis is attached hereto as *Exhibit 5.*

66.    The Debtors have no publicly traded securities.

67.    A list of the Debtors' real estate leases is attached hereto as *Exhibit 6.*

68.     No committee of creditors has been formed in these cases to date.

### REORGANIZATION PROSPECTS

69.    Through the Chapter 11 process, the Debtors intend, *inter alia*, to (a) attempt to resolve their financial issues so that they may gain access to necessary capital sources, (b) analyze and develop a business plan that will best maximize the value of their properties and their business, and (c) restructure their debt obligations through a confirmed plan of reorganization.

70.    By seeking bankruptcy protection, the Debtors will be able to protect and preserve their assets and businesses for the benefit of their creditors and parties in interest.  I believe that the Debtors will be able to utilize these proceedings to successfully emerge from Chapter 11.


*s/Richard J. Principi, Jr.*
RICHARD J. PRINCIPI, JR.

Sworn to before me this
14th day of June, 2011.

*s/Constance Lisowy*
Constance Lisowy
Notary Public, State of New York
No. 01L16110900
Qualified in Suffolk County
Commission Expires June 1, 2012

# EXHIBIT 1

# CONSOLIDATED
# LIST OF DEBTORS' TWENTY (20)
# LARGEST UNSECURED CREDITORS
# [EXCLUDING INSIDERS]

| Creditor name | Nature of Claim | Is claim Contingent, Unliquidated, Disputed or subject to setoff | Amount of Claim |
|---|---|---|---|
| J.A.M.E. LLC | Trade debt | | $29,175.00 |
| Julio Vasquez | Trade debt | | $90,000.00 |
| Konner Teitelbaum & Gallagher | Trade debt | Disputed | $31,553.00 |
| Martin Hand Surveyor | Trade debt | | $11,830.00 |
| Principi Builders, Inc. | Trade debt | | $375,300.00 |
| Principi Properties, LLC | Trade debt | | $313,700.00 |
| Richard J. Principi, Inc. | Trade debt | | $22,700.00 |
| Saskas Surveying Co., Inc. | Trade debt | | $9,039.00 |
| Studio Howe, P.C. | Trade debt | | 42,820.00 |
| Rise & Shine | Trade debt | | $58,910.00 |
| Morritt, Hock & Hamroff LLP | Trade debt | | $2,219.00 |

# EXHIBIT 2

# CONSOLIDATED
# LIST OF DEBTORS' FIVE (5) LARGEST
# SECURED CREDITORS

| Creditor name and address | Amount of claim | Brief description | Value of collateral securing claim | Is claim Contingent, Unliquidated, Disputed |
|---|---|---|---|---|
| Madison Realty Capital, L.P. | $17,000,000.00 (approx.) | Mortgage under certain Loan Agreements dated August 20, 2007 | Unknown | Unliquidated |

# EXHIBIT 3

# PENDING LITIGATIONS
# AGAINST THE DEBTORS


# NONE

# EXHIBIT 4

# CONSOLIDATED SUMMARY OF
# DEBTORS' ASSETS AND LIABILITIES

| | |
|---|---|
| **TOTAL ASSETS** | **$unknown** |
| **TOTAL LIABILITIES**<br>**Priority:** $ 140,475.00<br>**Secured:** $17,000,000.00 (approx.)<br>**Unsecured:** $ 1,057,257.00 | **$18,197,732.00** |
| | |

# EXHIBIT 5

## CONSOLIDATED
### SCHEDULE OF ESTIMATED CASH RECEIPTS AND DISBURSEMENTS, NET CASH GAINS OR LOSSES, OBLIGATIONS AND RECEIVABLES EXPECTED TO ACCRUE BUT REMAIN UNPAID, OTHER THAN PROFESSIONAL FEES, FOR THE (30) DAY PERIOD FOLLOWING THE PETITION DATE

### [Period 6/1/11 to 6/30/11]

| | |
|---|---|
| **Estimated Cash Receipts:** | $0 |
| **Estimated Cash Disbursements:** | $0 |
| **Estimated Net Cash Gain:** | $0 |
| **Estimated Net Cash Loss:** | $0 |
| **Obligations Expected to Accrue but Remain Unpaid:** | $2,833.61[1] |
| **Unpaid Receivables Expected to Accrue but Remain Unpaid:** | $0 |

---

[1] This amount is for taxes based on a pro-rated amount and is not due until December 31, 2011.

# EXHIBIT 6

# LIST OF DEBTORS'
# REAL ESTATE LEASES

# NONE